# CHART AND CLAIMS AUDIT
# REPORT OF FINDINGS AND RECOMMENDATIONS

## Purpose of the Study

The purpose of this study was to review a statistically valid sampling of chiropractic claims and medical records (400) to assess compliance with billing practices, identify discrepancies, and to make determinations regarding the medical necessity of the services rendered.

This engagement was completed at the request of the United States Attorney's Office, District of Minnesota. Any and all documents and reports are being submitted directly to the United States Attorney's Office, District of Minnesota.

## Audit Methodology

Eide Bailly LLP performed an external review of the medical and insurance company records on a statistically valid sampling of 400 chiropractic claims. A total of 133 patient records were utilized to obtain the sampling. This external review was completed in the Eide Bailly LLP Fargo, ND office during the month of July 2002. The statistically valid sampling of claims was determined prior to this audit and review. This audit and review primarily focused on the selected 400 claims, but also included data and information from the entire universe. In order to gather and record information from the records, a chart review sheet was developed (2 pages) that included space to document pertinent information, as well as to document the frequency and dates of the chiropractic visits that were billed. Each patient record (both the clinic and insurance company record) was reviewed in its entirety, with any pertinent information documented on the chart review sheet. In addition, any other pertinent information (i.e. Independent Medical Examination reports) was photocopied and is included with the chart review sheet for that patient. Each patient record has a completed chart review sheet. These work papers will accompany this report and will be separately bound.

In addition to the audit and review, an attempt was made to contact the patients by mail in order to elicit their input regarding their chiropractic care following the accident. Letters were sent to all patients whose records were reviewed. The response could be either by mail or telephone. A self addressed stamped envelope was included with the mailings. In addition, forwarding addresses were requested through the post office, and the FBI also provided our office with recent addresses on those mailings that were returned to sender. To date, no written responses have occurred.

For clarification purposes, we have termed one visit to a chiropractor as a claim and/or a visit.

We noted substantial evidence that the documents and claims prepared and submitted by the clinics were abusive and/or fraudulent. However, in conducting this audit and determining the number of claim denials, we assumed the information contained in the clinics' patient files and information submitted to the insurance claims was accurate. These assumptions included the following:

1) an accident actually occurred as reported;
2) the victims in the accident actually sustained an injury and required follow-up care;
3) the victims in the accidents actually made visits to the chiropractic office as stated in the records;
4) the stated interventions actually occurred;
5) the patients of the chiropractic clinic had full knowledge of their care treatment;

and,

6) the chiropractic documentation contained in the patient file and insurance company claim file was accurate.

During our audit and review of the records, we identified a number of issues, concerns and findings. This report identifies those items.

**Benchmarking**

During this claims and medical record review and audit, the benchmarks utilized were from three primary sources: 1) the Minnesota Chiropractic Association Standards of Practice; 2) the Guidelines for Chiropractic Quality Assurance and Practice Parameters, Aspen Publishers, 1993; and 3) the Rand Corporation Study, The Appropriateness of Spinal Manipulation for Lower Back Pain, 1992.

The Minnesota Chiropractic Association (MCA) developed and issued the Standards of Practice with the expressed goal of providing "a set of guidelines for chiropractic rehabilitative care." In the preface of these standards, the MCA Standards of Practice Committee stated:

> Not only should chiropractors be the accepted source for the standards of practice information required by third parties, but the profession should also be depended on to provide, through its standards and protocols, greater understanding to those third parties concerning chiropractic care; the kind of problem treated, the structural and functional changes associated with the problem, the objective of the care, the responses sought, and the time that may be required to achieve and maintain the optimum health status for patients.

The Standards of Practice characterize chiropractic conditions based upon specific symptomatology. The Standards also outline the recommended treatment schedule based upon the nature, extent and severity of a patient's condition. With reference to "traumatically induced neuromusculoskeletal conditions," the Standards establish six categories:

1. Mild sprain/strain injuries.
2. Moderate sprain/strain injuries.
3. Considerable sprain/strain injuries.
4. Severe sprain/strain injuries.
5. Avulsion sprain/strain.
6. Disc rupture.

Each of the above six categories has a recommended treatment schedule that includes a range of the number of treatments for a designated period of time. These Standards were applied to this audit and review.

From the review of the random sampled 400 claims and the subsequent chiropractic diagnosis that was established for each claim, it was evident that nearly all would be considered "mild sprain/strain injuries." Very few of the claims were "moderate sprain/strain injuries." The treatment schedule established by the Minnesota Chiropractic Association for mild sprain/strain injuries is:

Daily for 1-3 days
0-3 times/week for 2-4 weeks
0-2 times/week for 2-4 weeks
0-1 times/week for 2-4 weeks

The treatment schedule for moderate sprain/strain injuries is:

Daily for 1-7 days
0-3 times/week for 4-6 weeks
0-2 times/week for 4-6 weeks
0-1 times/week for 4-6 weeks

Utilizing the standard treatment plans listed above, the highest number of visits that should occur for mild sprain/strain would be 27. The highest number of visits for moderate sprain/strain would be 43. These standards, in addition to the recommendations by the Independent Medical Examinations (IME) that occurred in a number of the cases, were the primary sources of benchmarks used in this review.

## Facts and Findings

From a listing of claims supplied by the United States Attorney's Office, District of Minnesota a random sampling of 400 claims was selected. The dates of the claims submitted were between July 1997 and April 2001. This time frame of claims data was readily available and made accessible for review.

The following is a listing of our objective findings.

- A total of 400 visits were randomly selected on 133 patients. Each visit represented a date a patient made a chiropractor visit.

- Of these 400 visits, 16 were duplicate visit dates with different modalities (i.e. the same patient was listed twice, both on the same date for the same visit, with a different modality code listed for each), bringing the total number of patient visits for the sample to 384.

- The claim dates ranged from July 1997 to April 2001.

- All claims were motor vehicle accident related and were being billed to an insurance company. The five insurance companies in this sample were Progressive, MSI, MetLife, Allstate and State Farm.

- A total of 64 (16%) of the random sample did not have a copy of a claim (1500 Form) included in the records. The 1500 Form is the standard claim form used to bill third party payers. A total of 84% of the random sample had a 1500 claim form.

- Of the visits reviewed (those that had a claim form), 282 had 4 or more modalities performed during the chiropractic visit on that date (88%); 51 had 3 or fewer modalities performed during the visit (12%).

- Of the 133 patients seen by the chiropractors, a total of 65 neurology referrals occurred. A list of the neurologists and the number of patients referred to them is attached in **Exhibit A**.

- On a random review of 35 neurology consults, 2 occurred within 1 month of the accident, 7 were between 1 and 2 months from the accident, 13 were 3-5 months past the date of the MVA, and 13 occurred 6 months or longer after the accident. This indicates 74% of the neurology referrals occurred 3 or more months after the date of the MVA. See **Exhibit A, Part 2**.

- Of the 133 patient charts reviewed, there was 50 MRI referrals made. Attached in **Exhibit B** is a list of the MRI providers, the number of MRI's completed by them, and the referring physician.

- The average per visit charge to the insurance company was calculated to approximate $103.60. See **Exhibit C** for the calculation of this figure. **Exhibit C** also includes a copy of the CPT codes used and the description of each.

- Of the 133 patient claims/charts reviewed, based on an Independent Medical Examination (IME) performed on the patient, our medical record review, and/or the Minnesota Chiropractic Association Standards of Practice, a total of 112 patient claims should have at least a portion of the chiropractic visits denied. In addition, 23 MRI's, 22 sonograms, and 26 neurology consults should be denied based on the same criteria. See **Exhibit D** for the comprehensive results of the medical record and claim review, and **Exhibit E** for the cumulated summary of this same review.

It should be noted that while a majority of the claims were in the "mild" sprain/strain category, we utilized the maximum visit numbers for "moderate" sprain/strain (43) to determine the recommended number of visits to be denied. This allowed for an additional 16 visits for those claims that actually fell into the

"mild" sprain/strain category. (From the Minnesota Chiropractic Association Standards of Practice).

- During the review of the medical records (chiropractic office record), there were 48 medical records that utilized a form where the practitioner filled in circles with a pencil next to the treatments provided. This "bubble" sheet was used to generate a progress note and the claim form. Each of these forms had a pre-printed number on it. On all medical records utilizing this type of documentation, the "bubble" sheets were in numeric order. This would indicate the forms were filled out for several visits at one time, otherwise, these pre-printed numbers would be in random order.

## Conclusion

The 400 chiropractic insurance claims reviewed were submitted to third party insurance payers for total charges that approximate $41,440 ($103.60/visit). The chiropractic clinics received payment from these insurance companies at nearly 100% reimbursement. A comprehensive review of the medical and insurance record was completed on 133 patients. These 133 patient records encompassed 7,949 chiropractic visits in total. After a thorough review, in our opinion, the insurance companies should <u>not</u> have paid, at a minimum, 49% of the claims reviewed. This estimate was established utilizing both the information from Independent Medical Examinations and from reference manuals including the Minnesota Chiropractic Association's Standards of Practice. The 7,949 visits referenced above would account for approximately $823,500 in insurance claims. With a denial rate equal to 49%, this equates to approximately $403,500 in claims denials at a minimum. In addition, as referenced above, there would also be denials for MRI's, sonograms and neurology consults. In **Exhibit E,** a calculation shows the total amount of the denial would approximate $440,300.

## Other Findings and Interpretations

In addition to the above objective data retrieved from the medical record and insurance claims, there were also additional findings and interpretations that we believe should be addressed. The following is a compilation of those findings and interpretations.

- At least 25 of the 128 patient records reviewed (19%) indicated the patient required an interpreter to communicate. In most situations, it appeared questionable whether the patient understood what the chiropractic plan of care was, and what their responsibilities included.

- As previously indicated, 82% of all chiropractic visits included 4 or more modalities of treatment. The most common combinations were chiropractic manipulation, mechanical traction, massage therapy, and electrical stimulation therapy (44% of the sample), and chiropractic manipulation, mechanical traction, electrical stimulation therapy and myofascial release (35% of the sample). Although the practice of utilizing multiple modalities during a visit is acceptable

in some situations, according to the Standards of Practice, performing multiple modalities 5-7 times per week for extended periods of time is not acceptable.

- The following are quotes from various Independent Medical Examinations (IME) that occurred on the records reviewed: "Maximum benefit is achieved in 12-16 treatments or after about 4-6 weeks." "The sonogram for cervical spine injuries is not considered a reasonable or necessary study for this type of injury...The use of a sonogram is not considered within the Standards of Care within the metropolitan area of Minneapolis or within the standards of care for this community...Ultrasonography is quite abstract and would not localize a specific muscle group as per the radiology report dated 9/27/99." (Dr. Richard Reut, D.O., Orthopedic consultant, referencing chiropractic care and sonograms). "Subjective symptoms for a soft tissue injury could be justified for a maximum of 8-12 weeks." "Chiropractic care 2-3 times per week over a course of 8-12 weeks is maximum for soft tissue injuries." (Dr. Mack, M.D.). These statements are congruent with the Minnesota Chiropractic Association's Standards of Practice and were utilized as benchmarks for this review.

- A significant number of the claims reviewed involved a loss of work by the patient. In all cases reviewed, the chiropractor was the certifying practitioner for the work release.

- On one of the records reviewed ([redacted]), it indicated that one of the employees at South Metro Chiropractic is from Somalia (his name is Burci). His job responsibilities include sitting at the front desk, interpreting, and giving rides to and from the clinic. In this particular case, this person was also the one that telephoned the patient requesting he come in to the clinic. (This patient was from Somalia as well).

- On one medical record reviewed ([redacted]), a progress note from 10/4/99 referred to the patient as "he". A follow-up progress note dated 12/6/99 referred to the patient as "she". On that same patient, the progress note on 12/6/99 stated the patient was involved in a motor vehicle accident on 8/11/<u>00</u>.

- On one medical record reviewed ([redacted]), a typewritten progress note was dated 5/3/98. This is the date the accident occurred. In addition, the 5/3/98 progress note stated, "The patient relates a history significant for a motor vehicle accident, which occurred on May 5, 1998."

- On one medical record reviewed ([redacted], the randomly selected claims in question for this report were 2/5/99 and 2/17/99. In the record, this patient had documented MVA's on 10/24/98, 12/14/98, 12/23/98, 1/2/99 and 5/4/99. It was extremely difficult to determine which accident justified the chiropractic visits, if any.

- On one medical record reviewed ([redacted]), the patient was involved in two separate MVA's, dated 3/6/98 and 4/13/98. With the first MVA, the insurance company was Crawford and Co. With the second MVA, the insurance company was MetLife. Chiropractic treatments occurred from 3/12/98 through 3/29/99. During the months of April through September 1998, the chiropractic clinic was billing both insurance companies, almost alternating the visits billed to each insurance company. This patient also had an Independent Medical Examination on 9/28/98, at which time she did not reveal anything about the accident on 4/13/98 (only the accident on 3/6/98 was documented).

- On at least three separate occasions when there was more than one person in a vehicle that was involved in an accident, these people would have the exact same treatment plan, including the frequency and number of chiropractic treatments. With regards to individualized treatment plans, this does not seem possible that two people in the same accident should have the exact same treatment plan. (Examples: [redacted]).

- On all medical records reviewed that utilized the "bubble" notes, neither the patient name nor the chiropractors name were included on the form. Some of the records with "bubble" sheets include [redacted]

- On one record reviewed, during the IME interview, the patient ([redacted]) was asked how she happened to go to the chiropractor after her accident. The patient stated that someone from the chiropractic office called her at home and told her she should come in to be examined.

- In each of the chiropractic records, a 5 x 7 card was utilized to log the date of the visit. In reviewing these cards, it would appear the dates should be in chronological order, given the fact they are utilized to log each visit. On a significant number of these cards, the dates are not documented in sequential order. Examples of discrepancies include dates being out of order, dates that are added in the margins, and duplicate cards that have differing dates than the original. **Exhibit F** includes photocopies of some of the cards in question.

- On all records reviewed that included a typewritten initial consultation, this consultation read almost exactly the same from patient to patient, changing only the patient name and description of the findings. In addition, several of the records included typewritten progress notes, which were the redundant computer-generated variety. Many of these progress notes did not include the patient name and/or the name of the treating practitioner.

- Progress notes and "bubble sheets" with pain rating scales all follow the same exact patterns. Pain ratings and frequency of visits in the plan of care only change on the first visit of a month. Bubble sheets are all marked "symptoms unchanged" from previous visit.

- The majority of patients have differing signatures on clinic sign-in sheets throughout the course of care. Multiple patients have the same handwriting on the sign-in sheets. One example of this is signatures that all have an "i" with a circle rather than a dot in the same handwriting. (Some examples include [redacted]).

- **None** of the patients reviewed had progress notes stating that care could be discontinued due to improvement in patient status. Most visits ceased when further insurance benefits were denied. At this point, all patient progress notes would state "symptoms unchanged".

- Many patients are seen 5 and even 6 days in a row. Often the differing signatures occur during these times. In a telephone interview between the patient [redacted] and our firm on August 22, 2002, [redacted] stated that he was seen three times a week for a long period of time. When asked if he was ever seen every day, he responded that he had not; it was too far to drive every day. His records reflected visits occurring more often than three times per week, such as the weeks of August 12, August 18, September 15 and September 22, 1997.

  Another example of this is [redacted]. On 1/16/99 as well as in all following progress notes, it says the patient's pain is less intense, much reduction in pain, now subacute. Patient visits increased to five visits per week the week of 1/18/99 and four visits the week of 1/25/99.

- The plan of care in the progress notes and the frequency of visits very often do not correlate. In the case of [redacted] the further the time out from the accident, and as each progress note indicates improvement in his symptoms, the frequency of visits increases. When the progress note of 10/21/98 indicates that he is now in a chronic state and "Patient is not rescheduled and will call for appointment as needed", the chart indicates that he was then seen on 10/26, 10/27, 10/28, and 10/29/98.

- There are times when the index cards, progress notes, and billing statements indicate a visit however there is no signature on the sign-in sheet at the clinic (i.e. [redacted]). There are other times when patient signatures are noted on the sign-in sheets on dates that are not documented in the patient record as visit dates (i.e. [redacted] on 7/9/00).

- [redacted] changed chiropractors after 38 visits. He stated to the new chiropractor that he changed because "no x-rays were ever done, only brief exams completed and no spinal manipulation." All visits were billed as 2-3-region

manipulation in addition to massage therapy, electrical stimulation, and mechanical traction.

- There are numerous clinic sign-in sheets missing including 3/2, 4/4, 5/7, and 5/17/99.

- It is difficult or impossible to ascertain whom the treating chiropractor is in some cases. The "bubble sheets" do not name the chiropractor. In the case of [redacted], the billing was sent out with Dr. Bruno as the treating chiropractor. The insurance company refused payment as he was not the treating practitioner. It was rebilled with Dr. Evangelist's name as the treating practitioner.

- A home exercise program is never a part of the treatment plan that would be expected as the standard of practice.

**Specific Claim File Findings**

1. [redacted] - Claim # 2567110057. 48 of 83 visits were denial recommendations based on the Standards of Practice. Of interest, however is that on dates 6/10/99, 9/1, 9/3, 9/13/99 there are no progress notes or billings for those dates, however [redacted] is signed in as a patient on the office sign-in sheets. In addition, the signatures on the sign-in sheets vary significantly on many dates. The overall impression is to question the veracity of any of the claimed visits.

2. [redacted]. - No signature present on the 3/8/99 sign-in sheet and differing signatures on 5/13/99 and 7/14/99 for the same patient. These visits could possibly be denied as the overall impression is the patient was not in the clinic on those dates.

3. [redacted]. - 76 of 110 visits were recommended to be denied based on the Standards of Practice, however there are also varying signatures on dates, and signatures on 4/28 and 10/16/00 with no corresponding progress notes or bubble sheets. This is in addition to 5 dates without signatures and 7 dates without sign-in sheets. The overall impression is to question the veracity of any claimed visits.

4. [redacted]. - 67 of 102 visits were recommended to be denied. Additional findings include no progress notes for the month of September, differing signatures on multiple dates, a different signature on 7/9 for this patient, however the date was not written on the index card, and there are no progress notes or bubble sheets for this date. The overall impression is to question the veracity of the entire claim.

5. [redacted] – 52 of 93 visits were recommended to be denied. Additional findings include differing signatures on most visits. The overall impression is to question the veracity of the entire claim.

6. [redacted]. – All visits were recommended to be denied due to the index card stating the patient is "male" and the patient is actually female. Additional findings include no

signatures on the sign-in sheets on 5 dates, 2 dates with signatures and no visits recorded on the index card, progress notes, or bubble sheets, and differing signatures on most visit dates. The overall impression is to question the veracity of the entire claim.

7. [redacted] – The entire claim was recommended to be denied due to the lack of verification of the attending physician, and the lack of progress notes and "index card" to record visits. The file contains only "bubble sheets" without physician and/or patient name to identify the file. In addition, there are no signatures on the sign-in sheets for 4 visit dates, differing signatures on multiple dates, and a signature on 7/19/99 without a corresponding progress note or bubble sheet. The overall impression is to question the veracity of the entire claim.

8. [redacted]. – Additional findings include no clinic sign-in sheets for the month of April 1999, therefore we are unable to validate the visits. This would result in an additional denial of 6 visits.

9. [redacted] – 14 visits were recommended to be denied based on the lack of verification of visits as there are no signatures on the sign-in sheets for those dates. Of additional interest is there is a break in visits between 12/24/98 and 1/13/99. It is after the resumption of the visits on January that the signatures do not appear on the sign-in sheets.

10. [redacted] – No visits denied, however of interest is that she was signed in on 6/2/00. No progress notes or services are billed for that date. This is a visit date that [redacted], a person injured in the same accident, was seen.

11. [redacted] – All visits were recommended to be denied due to the inability to verify the visits due to a lack of sign-in sheets and dates on the index card. Additionally, there is no signature on the sign-in sheet for a visit on 7/2/98. There are 2 progress notes on 10/24/97. One note states his condition is intermediate; one states his condition is subacute. This adds to the overall impression of the need to question the veracity of the visits.

12. [redacted] – This patient is 3 years old. The notes refer to him as "[redacted]" and read, "[redacted] states his pain is an 8." A 3-year-old child is not developmentally capable of expressing pain on a numeric scale. The progress notes do not indicate how pain/symptomatology is being determined in order to decide on a course of treatment. The Standards of Practice dictate that the treatment plans must be age-specific. Progress notes offer statements attributable to [redacted]hat are not developmentally possible for a child of this age.

13. [redacted] – 44 of 79 visits were recommended to be denied due to the standards or the inability to verify the visits due to a lack of sign-in sheets. There are also multiple differing signatures on the sign-in sheets, no documentation of visits in January and March other than the billing claim, there was no signature on the sign-in sheet for 12/07/00, and no index card in this file with visit dates. The overall impression is to question the veracity of the entire claim.

14. [redacted] – 45 of 53 visits were recommended to be denied. Additionally, 5 visits that were billed have no progress notes. The patient had a prior history of lower back pain. When seen by a medical doctor, she complained only of lower back pain, however the progress notes continue to describe neck, shoulder, and thoracic pain for the next 6 months. The progress notes from 3/5 through 3/30/98 discuss range of motion (ROM) measurements being taken and "recorded as _______". No actual measurements are ever recorded. Also, there are differing signatures on various sign-in sheets. Altogether, the overall impression is to question the veracity of the entire claim.

15. [redacted] - All claims were recommended to be denied due to documentation issues. All progress notes contain the statement "ROM measurements taken as a reference point for measuring improvement. Measurements are recorded as follows: ____". There are no recorded measurements in any of the notes, therefore documentation is either incomplete or inaccurate (measurements not taken). This patient had a second accident during the course of treatment for the initial accident. The progress notes do not reflect this and in fact state the patient is improving. The patient began seeing a different chiropractor after the second accident. The second chiropractor ([redacted]) was unaware of any injuries from a prior accident and believed all current injuries were from the second accident. Dr. Evangelist continued to bill for on-going care from the first accident even as [redacted] was treating the patient for injuries from the second accident. The first MVA occurred on 9/21/98 and the start of treatment did not occur until 10/24/98. On 10/12/98 the patient stated through his interpreter that he is fine and unsure about needing any treatment. This would lead to question the medical necessity of the treatment. There is no signature on the sign-in sheet for 3/1/99, and there are differing signatures on many of the other sign-in sheets.

16. [redacted] – Additional findings include missing sign-in sheets for 4 visit dates, and differing signatures on most visit dates.

17. [redacted] – The patient switched chiropractors stating, "no x-rays were ever done, only brief exams were completed and no spinal manipulation was ever completed." Each visit billed included massage therapy, electrical stimulation, mechanical traction, and <u>2-3 regions manipulation</u>. There are differing signatures on many sign-in sheets, as well.

18. [redacted] – The patient was under Dr. Bruno's care for a prior MVA at the time of the second MVA on 2/16/98. While documentation shows a new patient assessment indicating a diagnosis of lumbar, thoracic, & cervical sprain/strain, post-traumatic cephalgia, and cervicobrachial syndrome, the progress note of the same date states "Patient enters the office for today's visit and states pain in neck region remains the same. He indicates he is feeling quite a bit of improvement in the amount of shoulder pain. A report that the pain in the thoracic area is less intense was given. He also states there has been a reduction in the amount of pain felt in the low back." An IME was done on 4/13/98 regarding the care following the first accident and the patient was found to have a normal orthopedic exam and that he had reached pre-accident (11/18/96) status. There is no signature for this patient on any sign-in sheets from 3/2/98 through 4/12/99, therefore the visits cannot be validated.

19. [redacted] – On 3/22/00 this patient received an Independent Chiropractic Examination. Excerpts from that report include: 1) Dr. Czichray's notes state the accident was a complete surprise, while during this examination the patient states she was able to brace herself; 2) Dr. Czichray's notes reflect the patient hit her head. During this visit the patient does not recall hitting her head; 3) Dr. Czichray's notes do not reflect the fact that he treated this same patient in May/June 1999 for another MVA; and 4) The progress notes do not document progressive improvement. During this Independent Chiropractic Examination, two of the tests performed showed "symptom magnification."

## Concluding Statements

The findings and rationale for this audit and review were based on the Minnesota Chiropractic Association's Standards of Practice, as well as the judgment of a number of Independent medical examinations that occurred on patients in this sample. The findings were not only extensive and wide-spread, but also did not conform to many of "usual" rules we tend to follow in the health care arena (i.e. signing documentation, individualizing care, providing care within the Standards of the discipline, etc.). Conservatively, we would recommend at least 49% of the total claims that occurred with these 133 patients be denied.

We also found the record keeping containing constant errors and discrepancies. This has been extensively documented in this report. Everything from the sign-in sheets, to the visit documentation (or lack of), to the claims themselves were suspect. Again, with the number of discrepancies that were found, it is difficult to establish any credibility in these chiropractic clinics.

Eide Bailly LLP staff conducted this audit and review. Resumes and background information is attached in **Exhibit G.**

U:\Clients\12402\consulting\12402 Chart Audit Rpt 0902.doc